**Niles B. WANGER and Shirley Wanger, Plaintiffs-Appellees,**

**v.**

**Ray BONNER, Individually and in his official capacity as Sheriff of DeKalb County, Defendant-Appellant,**

**Robert W. McCullough, etc., et al., Defendants.**

No. 78–2683.

United States Court of Appeals, Fifth Circuit.

July 14, 1980.

Rehearing Denied Sept. 5, 1980.

E. Christopher Harvey, Wendell K. Willard, Decatur, Ga., for defendant-appellant.

Albert Horn, J. M. Raffauf, Atlanta, Ga., for plaintiffs-appellees.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Niles and Shirley Wanger brought this action under 42 U.S.C. § 1983 against the former sheriff of DeKalb County, Georgia, Rayburn L. Bonner, and two of his deputies, Robert W. McCullough and Charles T. Bell, alleging that the defendants had violated their fourth amendment right to be free from unreasonable searches and seizures. The parties tried the case before a jury, which found for the deputies but returned a verdict in favor of the Wangers against Bonner and awarded them twenty-five thousand dollars in compensatory damages. On this appeal Bonner contends that the verdict rendered against him must be reversed. He asserts that under this court's decision in *Baskin v. Parker,* 602 F.2d 1205 (5th Cir. 1979) (on rehearing), he could not be held liable for the acts of his deputies in which he did not participate; that he could not be held liable for establishing the policies pursuant to which the deputies acted where the jury found that the deputies had not violated the plaintiffs' constitutional rights; and that the Wangers failed to establish a violation of their fourth amendment rights since the deputies acted pursuant to a valid warrant. We affirm.

## I.

On January 3, 1975, McCullough and Bell, deputy sheriffs in the DeKalb County Police Department, went on duty at midnight. Their assignment was to attempt to locate persons for whom arrest warrants were outstanding. Deputy McCullough had several months experience serving arrest warrants, but Deputy Bell had been assisting him for only a month. Pursuant to his usual practice, Deputy McCullough selected approximately twenty to twenty-five arrest warrants from among the outstanding warrants held by the sheriff's office, which warrants he and Deputy Bell would attempt to serve during their eight hour shift. Among the warrants that he selected on the night of January 3, 1975, was a bench warrant issued by a Forsyth County state court judge authorizing the arrest of Jimmy Leon Payne for his failure to appear to answer the misdemeanor traffic offense of driving under the influence of alcohol. The back of the warrant and the transmittal letter from the Sheriff of Forsyth County attached to the warrant both listed Payne's address as "306 Candler St." in Atlanta, Georgia, a location in DeKalb County. The warrant did not provide a description of Payne and the spaces on the form transmittal letter that provided for a description were blank.

Shortly after 1:30 A.M. the two deputies arrived at 306 Candler Street, the location of a house in which the Wangers had resided for three years. While Deputy Bell watched the rear of the house, Deputy McCullough knocked on the locked door to a screened porch on the front of the house. He aroused Niles Wanger, whose identity was not known to him at that time, and informed him that he was a police officer. Wanger came out of the house in his robe and addressed Deputy McCullough through the screen door to the porch. When McCullough advised him that he had an arrest warrant for a Jimmy Leon Payne of that address, Wanger denied that he was Payne and stated that no such person resided at that address. The events that followed were disputed by the parties.

McCullough testified that he then informed Wanger that he would have to produce some identification to verify that he was not Payne and that they would have to search the house to ascertain whether Payne was present. Wanger unlocked the screen door to allow McCullough to enter the porch. McCullough requested Bell to join him and went onto the porch. Wanger and his wife testified that Wanger then told McCullough that he would get some identification from inside and asked him to wait on the porch because his wife was not dressed. McCullough denied that Wanger had mentioned his wife's nudity. When McCullough attempted to follow Wanger through the front door to the house, Wanger, who is five feet nine inches tall and weighs one hundred thirty-seven pounds, pushed McCullough, who is six feet tall and weighs two hundred twenty-five pounds, back across the threshold onto the porch, telling him that he could not come into his house. McCullough, apparently using some minimal force, proceeded into the house and instructed Deputy Bell to check Wanger's identification while he searched the house for Payne.

Bell and Wanger entered the Wangers' bedroom where Wanger established his identity by producing a driver's license, a pistol permit, and some other piece of identification. Bell then noticed a loaded revolver on a bedside table, which he confiscated to prevent its use by Wanger, who was becoming increasingly angry and belligerent. While Bell was checking Wanger's identification, Deputy McCullough had undertaken a cursory, but thorough, search of the house. He proceeded through the house without incident until he reached the back bedroom occupied by the Wangers' two-year old child. The deputies' initial attempts to arouse the residents of the house and their entry into the house had awakened and alarmed the child. Shirley Wanger, who was nude at the time, went into the bedroom to comfort her child. When McCullough reached the bedroom during the course of his search he shone his flashlight into the unlit room prior to entering, thereby momentarily exposing Shirley

Wanger's state of nudity. Wanger, who could see McCullough from his location in a front bedroom, called out that his wife was not dressed and was in that room. McCullough told Wanger to bring her some clothes or a blanket, stating that he had to search the room. Once she was attired in a blanket, he finished searching the room.

After completing his search of the house Deputy McCullough arrested Wanger on charges of simple battery and obstructing an officer in the performance of his duty based on Wanger's attempts to prevent him from entering the house. Bell and McCullough then carried Wanger to the DeKalb County jail, together with his revolver, which they informed him he could obtain after his release by proving his ownership.

At trial the testimony of the witnesses for both sides was in substantial dispute concerning the general behavior and demeanor of Wanger and the two deputies once they entered the house. The Wangers testified that the deputies used profane, abusive language and refused to show them the arrest warrant upon which they based their authority to conduct the search. Bell and McCullough, however, testified that they were polite and that Wanger continually cursed them, attempted to thwart their efforts to execute the arrest warrant, and threatened that he would cause them to lose their jobs.

In August, 1975, the Wangers filed suit against Deputies Bell and McCullough and DeKalb County Sheriff Rayburn Bonner under 42 U.S.C. § 1983, alleging that the deputies' actions in attempting to serve the arrest warrant for Jimmy Leon Payne had violated their fourth amendment right to be free from unreasonable searches and seizures. The Wangers also alleged that the deputies had acted under Sheriff Bonner's control pursuant to policies and procedures that he had established. In response Deputies Bell and McCullough asserted a qualified immunity defense, arguing that they had acted in good faith on the basis of their reasonable belief that Jimmy Leon Payne could be found at 306 Candler Street due to the address listed on the bench warrant.

Sheriff Bonner defended on the ground that he could not be found to be vicariously liable for any improper acts by his deputies and that the deputies had not violated the fourth amendment's prohibition of unreasonable searches and seizures.

From the jury's verdict in favor of Deputies Bell and McCullough but against Sheriff Bonner, awarding the Wangers twenty-five thousand dollars in compensatory damages, Bonner brought this appeal. He urges that he cannot be held vicariously liable for the actions of his deputies, that the deputies did not violate the Wangers' fourth amendment rights since they acted pursuant to a valid arrest warrant, and that he cannot be held liable for any policies that he may have adopted since the jury's verdict in favor of the deputies constituted an implicit finding that their actions did not violate the Wangers' fourth amendment rights. The Wangers did not appeal the verdict in favor of the defendant deputies.

## II.

Defendant Bonner contends that the district court's pretrial order, the evidence presented by the parties, and the district court's instructions to the jury all limited the issue of his liability to the question whether he was vicariously liable for the conduct of Deputies Bell and McCullough. Noting this court's decision in *Baskin v. Parker*, 602 F.2d 1205 (5th Cir. 1979) (on rehearing), that vicarious liability was not a viable theory of recovery in a § 1983 action, Bonner asserts that the district court erred in not granting his motion for a judgment notwithstanding the verdict. The Wangers respond that at all stages of this litigation one of the bases on which they have argued that Bonner should be liable was his promulgation of the policies concerning the serving of arrest warrants pursuant to which the deputies acted. They argue that by presenting evidence that the deputies

acted in accordance with policies implemented by Sheriff Bonner, they demonstrated a causal connection between actions by Bonner and the deprivation of their constitutional rights.

In *Baskin* this court held that a sheriff could not be held liable under 42 U.S.C. § 1983 for the unlawful actions of his deputies on the basis of vicarious liability. *Id.* at 1207–08. The plaintiffs could, however, recover damages from the sheriff if he actively participated in the actions causing the deprivation of the plaintiffs' constitutional rights. *Id.* at 1208. Subsequent to *Baskin*, a plaintiff seeking to impose liability upon a supervisory official for the acts of his subordinates must show that the official was personally involved in the activities resulting in the deprivation of the plaintiffs' constitutional rights. *Watson v. Interstate Fire & Casualty Co.*, 611 F.2d 120, 122 (5th Cir. 1980). He must establish a causal connection between an act of the supervisory official and the alleged constitutional violation. *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979).

We conclude that the Wangers met this burden of proof by presenting evidence from which the jury reasonably could have concluded that Deputies Bell and McCullough acted pursuant to policies implemented by Sheriff Bonner. When they went on duty at midnight, Deputies Bell and McCullough had the assigned task of serving outstanding arrest warrants, including warrants for misdemeanor traffic offenses. While both deputies and Sheriff Bonner testified that the Sheriff's Department had no written policies concerning the serving of arrest warrants,[1] Deputy McCullough's testimony reveals that the standard instructions from the Sheriff's Department were always to search the premises when informed that the person named in the warrant was not present at the address listed

---

1. In response to the question whether he had established any written procedures for serving arrest warrants at the time of the events underlying this suit, Bonner stated:

 I don't know if they were directives put out. Some were put out by my chief deputy and some were put out by myself, sir. I can't say what was actually in writing or black and white except in conjunction with what we had dictated to the officers through state law, sir.

on the warrant.[2] Sheriff Bonner acknowledged on cross examination that his policy at the time in question was to have the officer serving the warrant conduct a complete search of the premises for the person to be arrested solely on the authority of an arrest warrant bearing the address at which the premises were located. Upon questioning by the Wangers' attorney, Sheriff Bonner also admitted that his deputies would not have violated any policy of his by attempting to serve a "no show traffic warrant" in the early morning hours and that no attempt was made to verify the correctness of addresses on warrants received from other counties prior to attempting to serve them.[3] In his instructions to the jury the district judge stated:

> Now, the former sheriff of DeKalb County, that is, the defendant Ray Bonner, although not participating in the activities of his deputies which are the subject of this lawsuit, may be held liable if you find that he failed to adequately supervise or train his deputies, thus causing a violation of the plaintiffs' civil rights. Even though the defendant sheriff, that is, Ray Bonner, did not participate in the

acts which are the subject of this action, he may be held liable if he knew or should have known the acts were taking place and acquiesced in them.

While this instruction does not explicitly state that Sheriff Bonner could be found liable if he promulgated policies for serving arrest warrants that caused the alleged deprivation of the Wangers' constitutional rights, in light of the evidence presented by the Wangers that the deputies acted pursuant to policies adopted by Sheriff Bonner, the jury reasonably could conclude that he knew or should have known that the allegedly unconstitutional acts were occurring and acquiesced in them.

■ Under the trial judge's instructions the jury was not permitted to find Bonner liable for a failure to adopt policies to prevent constitutional violations. This would not be an adequate basis for liability under § 1983. *See Rizzo v. Goode*, 423 U.S. 362, 375–76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561, 571–572 (1976). Rather, the instructions and proof confirm that his liability was based upon affirmative policies that he acknowledged adopting concerning the man-

---

**2.** On cross examination by the Wangers' attorney, McCullough testified:

> Q. Now, it's not unusual for a person— strike that. It's not unusual for you to have an incorrect address, in the sense that it practically never occurs, is that true, Mr. McCullough?
>
> A. It happens, yes, sir.
>
> Q. If you serve twenty warrants, it might happen for [sic] or five times in a night, is that right?
>
> A. Yes, sir.
>
> Q. Your procedure is to always insist upon searching the premises if the person says he's not that person.
>
> A. Yes, sir, that's what we do.
>
> Q. Pardon?
>
> A. We search the premises, make sure the person is not there we are looking for.
>
> Q. Who authorized you or instructed you to do that?
>
> A. That's what we were told to do, that we have to execute the warrant. We have to make a diligent search of the premises to make sure the party we are looking for is not there, so we can clear up the warrant.
>
> Q. That's standard instructions from the sheriff's office at that time.
>
> A. Yes, sir.

**3.** Sheriff Bonner's testimony was as follows:

> Q. So it would not violate any policy of yours to make an initial attempt to serve a no show traffic warrant at 1:45 a.m. in the morning.
>
> A. No, sir.
>
> Q. Have you established any procedures for checking on addresses of out of county warrants to ensure their correctness or had you at that time?
>
> A. We did after we established the fact that the person was not at the location, sir.
>
> Q. What were some of those checks that you would use?
>
> A. Course, we would use numerous things. We would try to get information from the city directory or the telephone directory but this was not always the case that they did live there. They may live with someone else. So this is not valid information. So you had to establish by more personal contact, checking with neighbors, and so on, where you could, sir.
>
> Q. Was it then your policy to conduct a complete search of the premises based solely on the authority of the arrest warrant bearing the address of such a home as in this case?
>
> A. Yes, sir.

ner in which arrest warrants were to be served, and that the evidence showed had precipitated the alleged unconstitutional actions of his deputies. Bonner's liability was not predicated solely upon the actions of his deputies, but instead rested upon his employment of deputies on the midnight shift to serve arrest warrants and his policy directives which the jury reasonably could have concluded caused the alleged deprivations of the Wangers' constitutional rights.

### III.

 The fourth amendment protects the privacy and personal security of individuals from arbitrary and oppressive interference by limiting the search-and-seizure authority of law enforcement officials. The standard against which the fourth amendment requires that we judge the validity of a search or seizure is one of reasonableness in light of the totality of the circumstances. *Pennsylvania v. Mimms*, 434 U.S. 106, 109–110, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 335–336 (1977); *United States v. Sink*, 586 F.2d 1041, 1047 (5th Cir. 1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). In determining the reasonableness of a particular law enforcement practice, a court must weigh the public interest promoted by the practice against its intrusion upon the personal rights of the individual protected by the fourth amendment. *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 553, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116, 1125 (1976). Some of the factors that the court should consider are "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884.

 The testimony of the witnesses presented by the parties at trial established that Deputies Bell and McCullough were attempting to serve a bench warrant received by the DeKalb County Sheriff's De-

partment from another county. The warrant authorized the arrest of Jimmy Leon Payne for his failure to appear to answer the misdemeanor charge of driving under the influence of alcohol, and it listed Payne's address as 306 Candler Street in Atlanta, Georgia. The deputies went to that location shortly before 2:00 A.M. Upon being roused from his sleep by Deputy McCullough, Niles Wanger, who had resided at that address for three years, denied that he was Jimmy Leon Payne or that any such person resided at that location. Over his objections and solely on the basis of the address contained on the out-of-county warrant, the deputies proceeded to search every room of the Wangers' residence. While the search was not as thorough as would be allowed in the execution of a search warrant, Deputy McCullough testified that he looked everywhere that a person could possibly have been hiding. Her maternal instincts having caused her to rush to comfort her frightened two-year old child without pausing to alter her nude state, Shirley Wanger suffered the embarrassment of being totally exposed to Deputy McCullough as he shone his flashlight into her child's bedroom. Upon completing the search, Deputy McCullough arrested Niles Wanger for simple battery and obstruction of a police officer based upon his efforts to prevent the deputies from entering his home.

The scope of the intrusion constituted a severe invasion of privacy. The intrusion consisted of more than a mere entry into the Wanger residence; the deputies conducted a thorough search of all parts of the home in which an individual could have been hiding and ultimately arrested Niles Wanger because of his ineffective efforts to prevent the deputies' forcible entry.

The manner in which the deputies conducted the intrusion did not serve to minimize any possible infringement of the Wangers' fourth amendment rights. No prior attempt had been made to serve the arrest warrant upon Jimmy Leon Payne at a more reasonable hour, and no one in the DeKalb County Sheriff's Office sought to verify the address contained on the out-of-county war-

rant by checking the phone book or city or county digests. The DeKalb County Sheriff's Office instead sought to serve the warrant, which charged Payne with failing to appear to answer for a misdemeanor traffic offense, for the first time during the early morning hours. The commission of the intrusion into the Wangers' private residence at night exacerbates the degree of the intrusion. *See Payton v. New York,* —— U.S. ——, ——, 100 S.Ct. 1371, 1394, 63 L.Ed.2d 639, 668 (1980) (White, J., dissenting); *Coolidge v. New Hampshire,* 403 U.S. 443, 480, 91 S.Ct. 2022, 2045, 29 L.Ed.2d 564 (1971); *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958).

The place of the intrusion, the Wangers' private residence, is entitled to the strictest fourth amendment protection against unwarranted intrusions. An individual's privacy interests are nowhere more clearly defined or rigorously protected by the courts than in the home—the core of fourth amendment rights. *Payton v. New York,* —— U.S. at ——, 100 S.Ct. at 1381–82.

The sole justification offered by the defendants for their intrusion into the Wanger home was that the deputies acted on the basis of a valid arrest warrant, which Sheriff Bonner contends entitled them to search the premises provided they had a reasonable belief that the person named in the warrant could be found therein. *See United States v. Gaultney,* 606 F.2d 540, 544 (5th Cir. 1979), *on rehearing,* 615 F.2d 642 (1980); *United States v. Cravero,* 545 F.2d 406, 421 (5th Cir. 1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977) and 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). He urges that the inclusion of an address for the person to be arrested in the warrant provided the deputies with a reasonable basis for the belief that Payne could be found within the premises at that location. The testimony of Deputies Bell and McCullough, however, reveals that out of every twenty warrants received by the DeKalb County Sheriff's Department for service, four or five might have an incorrect address.

Generally, the inclusion of the name of the person to be arrested on the arrest warrant constitutes a sufficient description to satisfy the fourth amendment requirement that the person to be seized be described with particularity. *See* Fed.R. Crim.Proc. 4(c). That general rule does not apply in this case. The inclusion of an address on a misdemeanor warrant will not suffice to allow a law enforcement officer to conduct a search of the premises located at that address in the middle of the night over the objection of the person residing therein, when that person establishes he is not the suspect named in the warrant, and the officer knows that in approximately twenty to twenty-five percent of similar instances the warrant address is incorrect.

We also reject Bonner's contention that since the deputies searched the Wangers' home on the authority of a facially valid arrest warrant, the Supreme Court's decision in *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), dictates that damages may not be imposed upon the defendant officers under § 1983. *Baker* does not require such a conclusion. In *Baker* the court ruled that the plaintiff had failed to allege a violation of his constitutional rights; whereas the evidence presented by the Wangers in this case established a violation by the defendants of their fourth amendment right to be free from unreasonable searches and seizures.

The public's interest in quick, efficient enforcement of the laws is certainly promoted by the processing of outstanding arrest warrants, yet this interest cannot justify the policies and practices of the DeKalb County Sheriff's Office that resulted in the events underlying this § 1983 action. The fourth amendment proscribes unreasonable searches and seizures. Under the circumstances of this case, the intrusion upon the Wangers' individual privacy rights caused by the attempt to serve this arrest warrant for Jimmy Leon Payne was patently unreasonable. The searching of a private residence in the middle of the night for a fugitive from a misdemeanor traffic charge based solely on the authority of an address

in the warrant, which had a twenty to twenty-five percent chance of being incorrect and which the long-time owner of the premises said was wrong, cannot be deemed reasonable in the absence of any verification of the address or a prior attempt to serve the warrant at a more reasonable hour. The evidence presented by the Wangers was more than sufficient to demonstrate a violation of their constitutional rights and to support a cause of action under § 1983.

### IV.

The jury's verdict in favor of the defendant deputies does not exonerate Sheriff Bonner from liability. The plaintiffs presented sufficient evidence demonstrating that the deputies acted pursuant to policies established by the DeKalb County Sheriff to allow the issue of Sheriff Bonner's liability to be presented to the jury. *See Boeing v. Shipman,* 411 F.2d 365 (5th Cir. 1969). This is not a case in which Sheriff Bonner was held vicariously liable under § 1983 for the unconstitutional actions of his deputies. As pointed out in Part II above, he was held to answer in damages for those violations caused by his adoption of particular policies and practices for the serving of arrest warrants. From the evidence presented, the jury could reasonably conclude that the Sheriff's use of his deputies on the midnight shift to serve arrest warrants without regard to the nature of the offense charged or the likelihood that an address on the warrant would be incorrect and his promulgation of a policy of searching the premises whenever the person to be arrested could not be found caused the deputies to undertake this unconstitutional search of the Wangers' home.

AFFIRMED.