[Cite as *In re J.F.*, 2024-Ohio-1950.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J.F. | : | APPEAL NOS. C-230464 |
| | | C-230465 |
| | : | C-230466 |
| | | TRIAL NOS. 22-1831Z |
| | : | T-22-693Z |
| | | T-22-692Z |
| | : | *O P I N I O N.* |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed in C-230464; Appeals Dismissed in
C-230465 and C-230466

Date of Judgment Entry on Appeal: May 22, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, *Margaret Kane*, Assistant Public Defender, and *Jessica Moss*, Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Judge.**

**{¶1}**  On the evening of May 22, 2022, two officers initiated a traffic stop of defendant-appellee J.F. for a suspected window-tint violation. The body-worn camera footage shows that the second officer called in the traffic stop over the radio at 11:50 p.m. The officers exited from their vehicle and approached the vehicle from behind, with the driver's window appearing to already be rolled down. As the second officer approached the vehicle, he described the call over the radio and said, "Unknown occupants, heavy window tint." As the first officer got to the trunk of the vehicle on the driver's side, he said to J.F., "Can you roll down any of the...all of these windows for me?" J.F. replied, "Yes, sir," and immediately rolled down all the windows. The first officer then shined the flashlight in the back left window and into the interior of the back seat as he approached. The second officer shined his flashlight through the back right window and said over the radio, "Okay, just [inaudible] one occupant." Both officers then moved on to shine the flashlight on J.F., but the first officer immediately returned the flashlight to the back seat upon noticing a firearm. The first officer then told the second officer, "Gun recovery...or gun."

**{¶2}**  J.F. was ultimately adjudicated for improper handling of a firearm in a motor vehicle in violation of R.C. 2923.16(B), a felony of the fourth degree if committed by an adult. J.F. appeals from this judgment.[1]

**{¶3}**  The first issue we are tasked with determining in this appeal is whether the officers violated J.F.'s right to be free from unreasonable searches and seizures by asking him to roll down all the windows to determine whether other occupants were

---

[1] We note that, in the consolidated actions, J.F. filed notices of appeal from his adjudications related to two other complaints that were filed against him arising from the traffic stop. However, no assignments of error were ultimately presented to this court regarding those adjudications. Accordingly, we dismiss the appeals numbered C-230465 and C-230466, relating to the cases numbered T-22-693Z and T-22-692Z.

present in the vehicle. J.F. argues that the officers' conduct was unreasonable as they had no reasonable, articulable suspicion that he was armed or dangerous. We disagree and hold that that the officers' protective conduct of asking J.F. to roll down his tinted windows during a lawful traffic stop to look in the back seat and determine whether any other occupants were present was not unconstitutionally intrusive conduct because, just like in *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the conduct was a minimally invasive additional intrusion to the lawful traffic stop that was reasonable and no more intrusive than necessary under the circumstances to protect the officers' safety.

{¶4} The second issue we are tasked with determining in this appeal is whether J.F.'s adjudication was supported by sufficient evidence and not against the manifest weight of the evidence where J.F. denied any knowledge of the firearm in the back seat. We hold the adjudication was supported by sufficient evidence and not against the manifest weight of the evidence where the evidence showed that J.F. was exercising dominion and control over the vehicle when the firearm was found, was the only occupant in the vehicle, admitted that he had previously touched the firearm, the firearm was plainly visible, and the location of the firearm in the vehicle permits the inference that J.F. could have placed the firearm in the exact position it was in by reaching behind him from the driver's seat and placing it there.

**I. The Motion to Suppress**

{¶5} In his first assignment of error, J.F. argues that the juvenile court erred in denying his motion to suppress evidence obtained in violation of his rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

## A. Relevant Factual and Procedural History

{¶6} J.F. filed a motion to suppress "all evidence the state may seek to introduce at trial," asserting that the evidence was obtained as a result of an unreasonable search and seizure since the potential window-tint violation did not result in the officers having a right to search the driver, the passengers, or the vehicle.

{¶7} At the hearing on the motion, the second officer testified that they observed the vehicle with excessive window tint and could not see the occupants in the vehicle when it drove past. When asked why J.F. was asked to roll his windows down, the officer replied, "For officer safety. We weren't able to see in the vehicle. We didn't know how many occupants were in the vehicle." The officer said that he pulled J.F. over for excessive window tint and agreed that he had no suspicion that anything else was going on in the car other than possibly driving with excessive window tint. He explained, "Because we can't see in the car. Either way, we didn't how [sic] many occupants were in the vehicle or objects in the vehicle or anything." He agreed that not being able to see in the back seat was concerning and said, "Because I don't know if there are more occupants in there, there could be a weapon. When I put out my stop, I advised dispatch—we advise them how many occupants in the car. I let them know unknown occupants, heavy window tint. That was before he rolled the window down. So on approach, I couldn't see anything. Even though the driver's window was down, I still couldn't see any of the passengers."

{¶8} When asked about his dispatch call and why he reported to dispatch how many occupants were in the vehicle, he replied, "We always let them know how many occupants are in the vehicle. Right now it's unknown. We don't know how many occupants are in the vehicle." When asked what the purpose of that was, he said, "Just in case if there's more occupants, five occupants, they would have sent us another car.

4

If we get into a physical altercation, people know—dispatch is aware how many occupants were in the vehicle." When questioned on whether he asks the driver of a vehicle to roll down the windows during every traffic stop, he answered, "I do if they have excessive window tint and I can't see in the vehicle. I'll ask them to roll down all the windows all the time." He said, "If I can't see in there, especially at nighttime, it decreases visibility, so less visibility, I'll ask them to roll down their windows all the time."

{¶9} The magistrate denied the motion to suppress after finding that J.F. was asked to roll down his windows for officer safety during a lawful traffic stop as the officers were unable to identify if there were any other occupants in the vehicle due to the excessive window tint, and the firearm was thereafter seen in plain view. J.F. objected to the magistrate's decision, asserting the same arguments that he made in his motion to suppress. The juvenile court overruled the objection, finding that the officers conducted a proper investigative search and found the firearm within the scope of that search, rather than through a search of the interior of the vehicle to locate the firearm.

### B. Standard of Review

{¶10} " 'Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.' " *State v. Childers*, 1st Dist. Hamilton No. C-220301, 2023-Ohio-948, ¶ 7, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence, then

independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the legal standard." *Id.*, citing *Burnside* at ¶ 8.

### C. Law and Analysis

**{¶11}** Generally, "[a] driver 'possesses "no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." ' " *State v. Brown*, 2d Dist. Montgomery No. 28153, 2019-Ohio-3684, ¶ 8, quoting *State v. Thompson*, 2d Dist. Montgomery No. 25658, 2013-Ohio-4825, ¶ 11. "Moreover, an officer's use of a flashlight to better illuminate a vehicle's interior does not convert the officer's action into a search implicating the Fourth Amendment." *Id.*, citing *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

**{¶12}** Here, J.F. argues that that trial court erred in denying his motion to suppress as he had a reasonable expectation of privacy in the back seat of the vehicle where the back windows were legally tinted from view by a passerby and the officers lacked reasonable, articulable suspicion that J.F. was armed or dangerous.

**{¶13}** "The touchstone of [the United States Supreme Court's] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Mimms*, 434 U.S. at 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331, citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonableness, of course, depends 'on the balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Mimms* at 109, citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

**{¶14}** In *Mimms*, while on routine patrol, two officers observed Mimms driving an automobile with an expired license plate. *Id.* at 107. The officers stopped

the vehicle for the purpose of issuing a traffic summons. *Id.* One of the officers approached and asked the driver to step out of the car and provide his license and registration. *Id.* Upon his exit, officers noticed a large bulge under his jacket. *Id.* The officers then frisked Mimms and discovered a loaded firearm. *Id.* The United States Supreme Court addressed the "narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment." *Id.* at 109. The Court first looked at "the side of the balance which bears the officer's interest in taking the action that he did." *Id.* There was no dispute that the officer did not suspect foul play from the driver at the time of the stop since there was no unusual or suspicious behavior. *Id.* Rather, it was the officer's practice to order all drivers out of their vehicles as a matter of course whenever they were stopped for a traffic violation. *Id.* at 110. The state argued that this was necessary for officer safety to reduce the possibility that the driver could make unobserved movements. *Id.* The Court first held that officer safety was a "legitimate and weighty" justification and recognized its prior statement in *Terry* that it would be unreasonable to require police officers to take unnecessary risks in the performance of their duties. *Id.*

{¶15} The Court then said:

Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the

only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a 'serious intrusion upon the sanctity of the person,' but it hardly rises to the level of 'petty indignity.' *Terry* * * * at 17. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

*Id*. at 111.

{¶16} Therefore, the United States Supreme Court held that the officer's order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment. *Id*. at paragraph one of the syllabus.

{¶17} Later, in *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the United States Supreme Court expanded the rule of *Mimms* to allow an officer to also order any passengers from the vehicle during a lawful traffic stop. In doing so, the Court held that, "[o]n the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or a passenger." *Id*. In fact, the Court said that "more than one occupant of the vehicle increases the possible sources of harm to the officer." *Id*. The Court then addressed the "personal liberty side of the balance" and said:

[T]he case for the passenger is in one sense stronger than that for the driver. There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside

8

the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great of that of the driver.

*Id.* at 413-415.

{¶18} Accordingly, the Court concluded:

In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

*Id.* at 414-415.

{¶19} Thus, " '[i]n determining the reasonableness of a particular law enforcement practice, a court must weigh the public interest promoted by the practice against its intrusion upon the personal rights of the individual protected by the [F]ourth [A]mendment.' " *State v. Gardner*, 135 Ohio St.3d 99, 2012-Ohio-5683, 984 N.E.2d 1025, ¶ 17, quoting *Wanger v. Bonner*, 621 F.2d 675, 681 (5th Cir.1980).

{¶20} Here, the record supports that, while J.F. was already lawfully detained,[2] the officers asked J.F. to roll down all the windows during the stop to ascertain—for their safety—if there were any other occupants in the vehicle. Thus, like in *Mimms* and *Wilson*, the officers' interest in taking the action was their safety. And although the officers had no particularized suspicion that J.F. was armed or dangerous, the fear for their safety in the situation was appreciable as they could not see into the vehicle to assess their risk due to the tinted windows.

{¶21} On the other hand, J.F. asserts that the intrusion upon his rights in this case is a "potentially" far greater invasion into the privacies of life than the situation in *Mimms* since "a driver is forced to expose much more of the private aspects of his life."

{¶22} In *United States v. Stanfield*, 109 F.3d 976 (4th Cir.1997), the Fourth Circuit Court of Appeals addressed a similar question concerning tinted windows. The court stated the issue as:

> Confronted with the grave risk that tinted windows pose to the safety of law enforcement personal, we address herein whether the government's substantial interest in officer safety during a lawful traffic stop outweighs the intrusion on the privacy interests of the vehicle's occupants which results when, because of the heavily tinted windows that prevent the interior compartment from being viewed, an officer opens a door of the vehicle in order to ensure that the vehicle's driver is unarmed and that there are no other occupants who might threaten his safety during the investigatory stop.

---

[2] J.F. does not dispute the validity of the initial stop.

*Id.* at 978.

**{¶23}** The court held that, "the substantial government interest in officer safety which exists when law enforcement officers must approach vehicles with heavily tinted windows far outweighs any minimal privacy interest the suspect retains in the otherwise visible interior compartment of his vehicle." *Id.* In doing so, the court said:

> [A]part from the fact that there is a considerably reduced privacy interest in a vehicle's interior passenger compartment as a matter of law, the driver and other occupants of a lawfully stopped vehicle have already had their liberty curtailed. Moreover, because the driver must comply with routine requests for identification and registration, he will be required at some point during the brief detention to expose the interior compartment of his vehicle to view through at least one window, if for no other reason than to interact with the officer. Of course, when the driver lowers the window, then much if not all of the car's interior will be visible to the officer.
>
> The additional interference with the occupants' privacy interests affected by the opening of one of the vehicle's doors would seem minimal when measured against the enormous danger law enforcement officers face when they approach a vehicle with heavily tinted windows. Such an intrusion would seem considerably less than the intrusions affected by ordering the driver and passengers to exit the vehicle and to proceed to the shoulder of the road, which were held in *Mimms* and *Wilson*, respectively, to be "*de minimis*" in comparison to the states' interests in protecting their law enforcement personnel under circumstances far less inherently dangerous than those existing when

11

the stopped vehicle has heavily tinted windows. Not only does the person subjected to the limited search entailed in the opening of the vehicle door not have his entire body exposed to the view of the officers and public, he also retains his liberty interest in remaining seated in his automobile during the duration of the detention. Indeed, the actual invasion of privacy entailed in an officer's opening of the vehicle door is indistinguishable from, if not precisely the same as, that which occurs when an occupant is required to open a door to exit a vehicle pursuant to an order given under the authority of *Mimms* or *Wilson*.

*Id.* at 982-983.

{¶24} We find *Stanfield* to be persuasive. Even where the back windows are legally tinted from view, a passerby or officer can still see into the back seat from the windshield or the front side windows, meaning that the back seat can, at most, be only partially shielded from view, and the interior of the vehicle will further be exposed through at least one window during the detention. Because the back seat can only be partially shielded *at best* and J.F. was already lawfully stopped, the further intrusion into the partial privacy of the back seat by rolling down the back windows does not appear to be more than de minimus when compared to the officers' concern for safety. Notably, that area of the vehicle that would be exposed by rolling down the windows would not be any more intrusive or exposing than what would be exposed when ordering a car full of occupants to step out of the vehicle, which is permissible under *Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41. In fact, rolling down the windows is a far less invasive practice as some of the lower areas of the vehicle remain under cover from the vehicle doors. Thus, we see no persuasive reason to hold that, although officers may lawfully order all occupants from a vehicle to ensure their safety during a

lawful traffic stop, they may not also ask a driver to roll down all excessively-tinted windows in order to determine whether there are other occupants in the vehicle that may warrant an order for those occupants to exit from the vehicle for their safety.

{¶25} Notably, there is no indication in the record that the officers' actions went beyond the scope of ascertaining the occupants of the vehicle. They looked in the back seat without crossing the plane of the vehicle. Both officers focused their attention on J.F. after looking for other occupants. It was only upon noticing the firearm in the back seat that the first officer returned his attention to the back seat. The second officer did not appear to have noticed the firearm. Notably, the firearm was located where a passenger would sit. It was not located on the floor, in the trunk (which was exposed to the officers since the back seats were folded down), under a seat, or anywhere that a passenger would not be located. The officer's flashlight was shined in the back seat for only two seconds before moving on to focus on J.F. prior to the officer noticing the firearm. Thus, there is no indication that the officers' actions were more intrusive than necessary to avoid a potentially dangerous condition. *See generally, e.g., New York v. Class*, 475 U.S. 106, 117-118, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (holding that, based on facts where "the similarities [to *Mimms*] [were] strong enough that the balancing of governmental interests against governmental intrusion undertaken in those cases [was] also appropriate," a search was reasonable where the search "was focused in its objective and no more intrusive than necessary to fulfill that objective.").

{¶26} Accordingly, we hold that the officers' protective conduct of asking J.F. to roll down his tinted windows during a lawful traffic stop to look in the back seat and determine whether any other occupants were present was not unconstitutionally intrusive conduct in violation of the Fourth Amendment because, just like in *Mimms*,

434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331, the conduct was a minimally invasive additional intrusion to the lawful traffic stop that was reasonable and no more intrusive than necessary under the circumstances to protect the officers' safety.

**{¶27}** Beyond that, "[t]he Ohio Supreme Court has held that, absent 'persuasive reasons,' the Ohio Constitution will be read in the same manner as the Federal Constitution regarding search and seizure issues." *State v. Washington*, 10th Dist. Franklin No. 00AP-663, 2001 Ohio App. LEXIS 1925, 4 (May 1, 2001), citing *State v. Robinette*, 80 Ohio St.3d 234, 239, 685 N.E.2d 762 (1997). J.F. appears to suggest that the Ohio Constitution affords him greater protection in this situation than the Federal Constitution. However, J.F. did not raise this argument below. Therefore, we decline to address it for the first time on appeal.

**{¶28}** For all the foregoing reasons, we overrule the first assignment of error.

## II. Sufficiency and Manifest Weight

**{¶29}** In his second assignment of error, J.F. argues that the juvenile court erred in adjudicating him delinquent when there was insufficient evidence to prove every element of the offence and the adjudication was against the manifest weight of the evidence.

### A. Standard of review

**{¶30}** "In reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime had been proven beyond a reasonable doubt." *State v. Brantley*, 1st Dist. Hamilton No. C-210258, 2022-Ohio-597, ¶ 14, citing *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶31}** "When considering a challenge to the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice." *Brantley* at ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

### B. The Record

**{¶32}** The body-worn camera footage shows that, once the first officer identified the firearm in the back seat, he told J.F. to just keep his hands up and J.F. replied, "Yes sir." He then had J.F. turn off the car, put his phone—which was connected to a call with his brother—in the passenger seat, and step out of the vehicle. In response to questioning, J.F. told the first officer that he had his "temps," and that the car was his mom's car. He then told his brother on the phone that he was "going to jail, probably, it seems like it. I don't know." He then appears to tell the first officer that the car was his brother's car. The first officer then led J.F. to the back of the car and the second officer read J.F. his rights. The second officer then asked J.F. whose car it was, and J.F. responded that the car was probably in his aunt's name. The first officer asked him where he was headed, and J.F. answered that he was headed to get his brother's girlfriend and said, "That's the only reason I'm out here." In response to questioning, J.F. told the second officer that he was driving from Mt. Healthy to Price Hill and that it was his first time being in the car, but that he was the only one who was in the car during the trip. He also said that he stopped at a gas station in Mt. Healthy.

The second officer then walked J.F. to the back right passenger window, which was still rolled down, and, while shining the flashlight on the firearm, said, "See that right there?" J.F. looked in the window and looked around and the officer repeated, "See that right there?" J.F. responded, "Oh, that's a gun!" The following exchange then occurred:

> Officer 2: See the way it's positioned, with the seats down? Do you believe that if you were driving from Mt. Healthy, with turns and breaking and everything like that, that gun would just sit just like that perfectly?
>
> J.F.: No sir.
>
> Officer 2: Okay. Have you handled that gun at all?
>
> J.F.: No sir.
>
> Officer 2: I'm not saying it's yours, but have you handled it?
>
> J.F.: Mm-mm.
>
> Officer 2: So, your DNA wouldn't be on it?
>
> J.F.: I don't know.
>
> Officer 2: Okay. So, what I'm going to ask you, we'll walk back to the car real quickly. * * * Do you know how DNA works? I know you're young and everything, do you know how DNA works?
>
> J.F.: Uh, I think.
>
> Officer 2: Okay. So, you know how fingerprints, like you leave something like a fingerprint?
>
> J.F.: Yeah.

Officer 2:    And sometimes it's hard to get a match on the fingerprint. Well, DNA, if you touch something, you leave your skin cells and your sweat and stuff like that if you touch something.

J.F.:    Mm-hmm.

Officer 2:    Your DNA will be on it.

J.F.:    Mm-hmm.

Officer 2:    So, that's what I'm trying to ask if you, if you—if you touched that at all?

J.F.:    Actually, I have touched it. But I didn't know it was in the car.

Officer 2:    You touched it when, today?

J.F.:    Yes, not today, but I touched it.

Officer 2:    Okay, when did you realize it was in the car today?

J.F.:    I didn't know it was in the car at all.

Officer 2:    You didn't know it was in the car today?

J.F.:    Huh-uh.

Officer 1:    How did it get in that position?

J.F.:    When I hopped in there, that was not in that position.

Officer 2:    Okay. So, it wasn't there when you got in the car?

J.F.:    (Shakes head no)

Officer 2:    But you told me you were the only person that's been in the car since you got in the car?

J.F.:    Right.

Officer 1:    Right?

J.F.:  Mm-hmm.

Officer 2:  So, where was it when—it wasn't in that position when you started driving?

J.F.:  No, I checked the whole...when I was in the car, I looked in the back and it wasn't there.

**{¶33}** When asked what J.F.'s demeanor was when he pointed out the gun, the second officer testified, "I want to say—he said he didn't see it. He acted like he seemed surprised, but he kind of went like this a little bit (indicating)." He agreed that J.F. exclaimed, "That's a gun," when he showed him the firearm. He said that he assumed J.F. saw the gun because it was in plain view. He agreed that J.F. maintained that he did not know there was a gun in the car. He also agreed that it was a possibility that the gun could have been out of sight somewhere when J.F. checked the back of the car. When asked if he speculated that the gun would move around while J.F. was driving, he replied, "I mean, would it move around, yes. I just don't—I guess, in my opinion, when I asked that question was that I don't believe that you drove around from Mt. Healthy to Price Hill and that gun sat right where it sat. It didn't fall into the trunk and come back up. It was just almost like it was just in immediate reach."

### C. Law and Analysis

**{¶34}** R.C. 2923.16(B) provides, "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator * * * without leaving the vehicle." J.F. asserts that the evidence does not show that he knowingly had the firearm.

**{¶35}** "To 'have' a gun, 'one must either actually or constructively possess' it." *State v. Banks*, 10th Dist. Franklin No. 11AP-592, 2012-Ohio-1420, ¶ 5, quoting *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 32. "Constructive

possession is knowingly controlling or maintaining power over a firearm 'either directly or through others.' " *State v. Hicks*, 1st Dist. Hamilton No. C-220540, 2023-Ohio-2209, ¶ 10, citing *State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 121. "But a person's mere presence in the vicinity of a firearm, alone, does not create an inference of constructive possession." *Id.*, citing *Phillips* at ¶ 47. "Rather, constructive possession may be inferred from a combination of facts, such as awareness of a firearm that is within easy reach." *Id.*, citing *Phillips* at ¶ 47. "Constructive possession may be demonstrated through circumstantial evidence." *Id.*, citing *State v. English*, 1st Dist. Hamilton No. C-080872, 2010-Ohio-1759, ¶ 32.

{¶36} J.F. points to the comparative cases of *State v. Harris*, 8th Dist. Cuyahoga No. 88765, 2007-Ohio-3916, and *Ohio v. Marneros*, 8th Dist. Cuyahoga No. 109258, 2021-Ohio-2844, and argues that this case parallels *Harris* and is unlike *Marneros* in that there was no evidence, beyond the location of the firearm, to prove that J.F. had possession and/or knowledge of the firearm.

{¶37} In *Harris*, the court found that the evidence was insufficient to show that a defendant, who was a passenger in a vehicle, knowing carried or had the firearm—which was found toward the front of the passenger seat of the vehicle, about four to five inches back, and leaning on its side against the seat adjustment bar—where the gun was positioned in a way where it was accessible to anyone in the front seat, and there was no evidence to establish that the car belonged to the passenger, or that the passenger knew the gun was in the car. *Harris* at ¶ 5, 14-15.

{¶38} In *Marneros*, the court found that the evidence was sufficient to show that the defendant, who was driving the vehicle, had "at the very least constructively possessed" a gun, which was located between the driver's seat and the center console of the car, where, although his girlfriend who was not in the car alerted the officers

19

over the phone of "her" gun in the car, which she allegedly placed there without the defendant's knowledge, the gun was found in the vehicle that the defendant was exercising dominion and control over and was likely visible to the defendant due to its location. *Marneros* at ¶ 2, 7, 39.

{¶39} J.F.'s assertion that this case parallels *Harris* is unpersuasive as the defendant in Harris was not driving the car, was not the only one in the car, and the location of the firearm could be accessed by either occupant. Here, although not the owner of the car, J.F. was exercising dominion and control over the car when the firearm was found, was the only occupant in the car, admitted that he had previously touched the firearm, and the firearm was plainly visible. Further, the body-worn camera footage and the photographs of the firearm's placement in the vehicle permit the inference that J.F. could have placed the firearm in that exact position it was in by reaching behind him from the driver's seat and placing it there. Accordingly, we cannot say that the juvenile court's inference of possession was not supported by sufficient evidence or was against the manifest weight of the evidence. Therefore, the second assignment of error is overruled.

### III. Conclusion

{¶40} Having overruled the assignments of error, we affirm the judgment of the juvenile court in the appeal numbered C-230464. Further, for the reasons stated in footnote 1, the appeals numbered C-230465 and C-230466 are dismissed.

Judgment affirmed in C-230464; Appeals dismissed in C-230465 and C-230466.

**BOCK, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry this date.