[Cite as *State v. Jackson*, 2024-Ohio-4770.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                    :        APPEAL NO. C-230660
                                            TRIAL NO.   B-2301917-A
    Plaintiff-Appellant,      :

                                  :

  vs.                             :

                                  :

TAYESHEAN JACKSON,                :

    Defendant-Appellee.       :

---

STATE OF OHIO,                    :        APPEAL NO. C-230661
                                            TRIAL NO.   B-2301917-B
    Plaintiff-Appellant,      :

                                  :

  vs.                             :

                                  :        *O P I N I O N.*

JOSHUA ANDREWS,                   :

    Defendant-Appellee.       :


Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: October 2, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellee Tayeshean Jackson,

*Jon R. Sinclair*, for Defendant-Appellee Joshua Andrews.

**BERGERON, Presiding Judge.**

{¶1} The investigation of an anonymous tip of a suspicious vehicle in an apartment complex parking lot concluded in a felony stop and arrest where defendants-appellees Tayeshean Jackson and Joshua Andrews (together, "Defendants") were ordered to roll down their windows, stick their arms out of the vehicle, drop the keys, and walk backwards towards the officers (one of whom had his weapon drawn). Once Defendants were handcuffed and taken into police custody, the responding officers discovered two firearms in the rear passenger compartment of the vehicle, leading to a two-count indictment of firearm-related charges for both Defendants. Defendants each moved to suppress the evidence, arguing that the officers did not have probable cause (or even reasonable suspicion) to justify the warrantless intrusion. The trial court agreed, granting Defendants' motions, and the State now appeals.

{¶2} We sua sponte consolidate the State's two separate appeals into a single opinion and judgment because the State raises identical arguments in both appeals, challenging the trial court's grant of the motions to suppress. Having carefully reviewed the evidence and the record, we defer to the factual findings made by the trial court and agree with Defendants. We overrule the State's assignment of error and affirm the trial court's judgments.

I.

{¶3} At officer roll call in April 2023, the Springfield Township Police Department briefed its officers that there had been a "shots fired" incident earlier that day and that several residents in the area had reported some growing tension among young adults in that area. Later that evening, two Springfield Township police

officers—Officers Davis and Meyer—responded to an anonymous and vague tip regarding a suspicious gold-colored vehicle in an apartment complex parking lot. According to Officer Davis, the apartment complex was "on the same street" where shots had been fired earlier, but the incident did not take place in the immediate area of the complex. Officer Meyer acknowledged that the tip did not contain any accusations of drugs or guns, and it appears from the record that the tipster only accused the vehicle and occupants of being "suspicious." Other officers also responded to the report and set up shop farther down the street as backup.

{¶4} In separate cruisers, Officers Davis and Meyer proceeded down two of the complex's driveways towards the rear parking lot, using their spotlights to scan the area. Eventually, the officers spotted a gold sedan matching the description given in the tip, and they illuminated the vehicle with their spotlights. Officer Davis observed "some sort of movement" in the vehicle, and Officer Meyer testified that he "noticed the passenger seat kick back and then the driver steering wheel kind of, like—it was almost like a leg hit it or an arm kind of shuffled it, and then headlights turned on, and then it started pulling off." Approximately 42 seconds after the officers arrived and shined their spotlights on the vehicle, the driver turned on the car and slowly drove out of the complex. Believing that the occupants of the vehicle had obstructed official business by attempting to flee from the police, Officer Meyer followed the vehicle and activated his siren and overhead lights to stop the car before it left the complex. The driver promptly stopped his vehicle.

{¶5} Officer Meyer addressed the occupants of the vehicle via his cruiser's loudspeaker and ordered them to roll down their windows, instructed the driver to drop the keys out of the window, and demanded that both occupants stick their arms

out of the windows. Officers Meyer and Davis testified that, at this point, they observed smoke billow from the vehicle and detected the odor of burnt marijuana. Both Mr. Jackson and Mr. Andrews complied with all of Officer Meyer's requests. Officer Meyer then began walking towards the vehicle with his weapon drawn, but Officer Davis suggested that they should instead direct the occupants to approach the cruiser. As directed by the officers, one at a time, Mr. Andrews and Mr. Jackson stepped out of the car and shuffled backwards towards the officers with their hands up, while Officer Meyer still had his weapon drawn. The officers ordered the men to kneel on the ground, and then they handcuffed both men and took them into police custody as several additional officers then arrived at the scene to assist.

{¶6} Once the officers had secured Defendants, they approached the vehicle, as they explained it, to ensure that no additional passengers were hiding in the back seat or trunk. As Officer Davis walked around the vehicle, he noticed two firearms in plain view in the rear passenger area. The officers also discovered marijuana in the vehicle. Defendants were each charged with one count of carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), and one count of improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16(B), but they faced no drug charges.

{¶7} Defendants separately moved to suppress the evidence of firearms uncovered during the officer's search of the vehicle, maintaining that the officers lacked probable cause to effectuate the arrest, and in the alternative, that no reasonable suspicion existed to justify the stop. In response, the State insisted that the officers had probable cause to arrest Defendants because they obstructed official business by driving away from the officers. It also argued that the seizure of the

firearms was proper under the plain view doctrine when the officers arrested Defendants, approached the vehicle, and saw the firearms on the rear passenger seat.

{¶8} At the hearing on the suppression motions, the State again argued that the officers appropriately stopped and arrested Defendants because they obstructed official business by attempting to flee from the parking lot. In support of this point, the State called both Officer Davis and Officer Meyer as witnesses. They testified that once the officers shined their spotlight on the vehicle, it was not free to leave and that when Defendants drove away, the officers then had grounds for the stop and arrest. In closing, the State reiterated its obstruction argument and offered no additional argument about the initial stop. After Defendants' closing argument, the State raised, for the first time, an additional argument that the time of night, rain, movements in the car, the car's tinted windows, the allegedly "high crime area," and the reported tensions in the area contributed to the officers' reasonable suspicion of criminal activity and justified their initial stop of the vehicle.

{¶9} The trial court granted Defendants' motions to suppress and made various factual findings, including that Defendants did not flee (and that they drove away at a low rate of speed), Defendants did not create a "substantial stoppage" of official business (as required for a violation of the obstruction of official business statute, R.C. 2921.31), Defendants complied with all of the officers' commands, and the officers used force in executing the stop. Ultimately, the trial court concluded that probable cause was required for the felony arrest that occurred and that the officers did not have probable cause for an arrest nor reasonable suspicion for a

*Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). It also denied an inevitable discovery argument from the State on those grounds, though it appears that the State never raised that argument. The State now appeals.

II.

{¶10} In its sole assignment of error in each appeal, the State contends that the trial court erred when it granted Defendants' motions to suppress, arguing that the officers had reasonable suspicion to stop Defendants, the officers' removal of them from the vehicle was permissible, the smell of marijuana gave officers probable cause to search the vehicle, and the firearms were discovered in plain view during a protective sweep of the vehicle. Notably, the State does not challenge on appeal the trial court's conclusion that the officers lacked probable cause to effectuate the stop and arrest.

{¶11} A motion to suppress "presents a mixed question of law and fact." *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 14, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. We "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). But this court "'must independently determine whether the facts satisfy the applicable legal standard.'" *State v. Thompson*, 2021-Ohio-3184, ¶ 10 (1st Dist.), quoting *State v. Taylor*, 2007-Ohio-7066, ¶ 11 (1st Dist.).

{¶12} The Fourth Amendment to the U.S. Constitution protects against unreasonable searches and seizures. Generally, "warrantless searches are per se unreasonable." *State v. Bacher*, 2007-Ohio-727, ¶ 8 (1st Dist.). But there are "a few well-established exceptions" to this requirement. *State v. Ulmer*, 2020-Ohio-4689, ¶ 13 (1st Dist.), citing *State v. Ward*, 2017-Ohio-8141, ¶ 13 (1st Dist.); *Katz v. United*

*States*, 389 U.S. 347, 357 (1967). As established in *Terry*, 392 U.S. 1, law enforcement officers may temporarily detain a person for a brief, investigatory stop when they have "'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *State v. Hawkins*, 2019-Ohio-4210, ¶ 19, quoting *United States v. Place*, 462 U.S. 696, 702 (1983). For their stop to be supported by reasonable suspicion, the officers must have "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014), quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). "The standard is objective: would the facts available to the officers at the moment of the seizure have warranted an individual of reasonable caution in the belief that the action taken was appropriate?" *State v. Houston*, 2020-Ohio-5421, ¶ 57 (1st Dist.), citing *State v. Andrews*, 57 Ohio St.3d 86, 87 (1991); *State v. Lopez*, 2006-Ohio-2091, ¶ 13 (1st Dist.).

{¶13} "[T]raffic stops constitute seizures within the meaning of the Fourth Amendment," and therefore "'must comply with the Fourth Amendment's reasonableness requirement.'" *State v. Grayson*, 2023-Ohio-4275, ¶ 9 (1st Dist.), quoting *State v. Slaughter*, 2018-Ohio-105, ¶ 10 (1st Dist.), citing *Whren v. United States*, 517 U.S. 806, 809-810 (1996). It is reasonable for officers to temporarily stop a vehicle and its occupants "if there is a reasonable and articulable suspicion that an automobile or its occupants are subject to seizure for a violation of the law." *Houston* at ¶ 58, citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Because the State stipulated that the seizure and subsequent search were conducted without a warrant, it carries the burden to show that the warrantless seizure was reasonable

8

and justified under an exception to the warrant requirement. *See City of Xenia v. Wallace*, 37 Ohio St.3d 216, 220 (1988).

**{¶14}** But not every citizen encounter with police constitutes a *Terry*-level temporary detention or a felony arrest seizure. Courts have identified "three general categories of police-citizen contacts for purposes of determining the protections afforded by the Fourth Amendment," including "(1) consensual encounter, (2) an investigative detention, or '*Terry* stop,' and, finally, (3) a seizure that constitutes an arrest." *State v. Hall*, 2016-Ohio-783, ¶ 16 (1st Dist.), citing *Florida v. Royer*, 460 U.S. 491 (1983) (plurality opinion); *State v. Mitchem*, 2014-Ohio-2366, ¶ 17 (1st Dist.). These categories help frame our inquiry, delineating what Officers Meyer and Davis could have done (a consensual encounter), what they actually did (a felony arrest), and what the State now argues they had the authority to do (a *Terry* stop). We discuss each in turn.

A.

**{¶15}** First, we discuss what could have happened here (without violating the Fourth Amendment) when Officers Meyer and Davis pulled into the parking lot and located the vehicle that matched the description of the "suspicious" vehicle tip: a consensual interaction with Defendants. "A consensual encounter occurs when a police officer approaches a person in a public place, engages the person in conversation, requests information, and the person is free to refuse to answer and walk away." *State v. Berry*, 2018-Ohio-4791, ¶ 23 (5th Dist.), citing *State v. Taylor*, 106 Ohio App.3d 741, 747 (2nd Dist. 1995). An officer's attempt at such a consensual interaction "does not constitute a seizure," and officers "may generally ask questions of that individual; ask to examine the individual's identification; and *request*

*consent* to search his or her luggage," for example. (Emphasis added.) *Florida v. Bostick*, 501 U.S. 429, 434-435 (1991). "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497-498 (1983), citing *Terry*, 392 U.S. at 32-33 (Harlan, J., concurring); *Terry* at 34 (White, J., concurring).

{¶16} But that did not happen here. Instead, the officers hung around the vehicle for about a minute, shining their lights on it without giving any signal that they were seeking to talk with or stop Defendants, before Defendants slowly drove away from the parking lot. At that time, Officer Meyer activated his siren and lights and initiated what developed into a felony arrest based on the officers' perception that Defendants had obstructed official business by leaving the parking spot. As we will discuss later in this opinion, the officers had no basis to initiate that stop in part because the tip included nothing about *any* alleged criminal activity. In fact, when Defendants started to drive out of the parking lot, the entire basis of the tip—that there was a "suspicious" vehicle and occupants, possibly "improperly parked" in the lot—had evaporated. If the car shouldn't have been there, it was leaving. As the officers themselves testified, the purpose of initially investigating the vehicle was to determine whether the occupants lived in the apartment complex or had some other reason to be there. Once Defendants took action to leave, there was nothing left to investigate.

{¶17} It is of course reasonable and appropriate for the officers to investigate a tip of suspicious activity. But a tip without any details, or any corroborating evidence of criminal activity afoot, offers officers little basis to do

anything other than a consensual encounter. That helps explain why the officers, and the State below, fixated on the obstructing official business claim to help supply the missing justification for what followed.

B.

{¶18} Next, we consider the implications of what actually happened here: a felony-level arrest that required probable cause. "Under Ohio law, an arrest occurs when there is (1) an intent to arrest, (2) under real or pretended authority, (3) accompanied by actual or constructive seizure or detention of the person, and (4) that is so understood by the person arrested." *State v. Hall*, 2016-Ohio-783, ¶ 18 (1st Dist.), citing *State v. Barker*, 53 Ohio St.2d 135 (1978), paragraph one of the syllabus.

{¶19} Unlike an investigatory, *Terry*-level stop, which only requires reasonable suspicion, a warrantless felony arrest requires probable cause, which is "'defined in terms of facts and circumstances "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."'" *State v. Jordan*, 2021-Ohio-3922, ¶ 19, quoting *Gerstein v. Pugh*, 420 U.S. 103, 111-112 (1975), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Thus, "the court must determine whether the facts known to the officers at the time of the arrest would "'warrant a man of reasonable caution in the belief'" that an offense has been committed." *Id.*, quoting *Beck* at 96, quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925).

{¶20} As evident from the officers' testimony and from the State's arguments below, the officers intended to arrest Defendants for obstructing official business as soon as Defendants drove away from their parking spot. And Officer

Davis agreed on cross-examination that what officers effectuated was a "felony stop." Further, by immediately ordering Defendants to stop the car, roll down their windows, drop the keys out of the car, keep their hands up, back up towards the officers, and get on the ground before being handcuffed and placed in a cruiser, all the while with at least one officer's gun drawn toward them, the officers seized Defendants in a way reasonably understood by Defendants as an arrest.

{¶21} Thus, the officers escalated their stop of Defendants far beyond what would have been justified to investigate their reasonable suspicion (if it existed) of criminal activity and safety concerns based on the circumstances leading up to Defendants' arrests. *See Terry*, 392 U.S. at 29 ("[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."); *Jordan*, 2021-Ohio-3922, at ¶ 18-23 (explaining the probable cause requirement for officers to effectuate an arrest); *see also State v. Hairston*, 2019-Ohio-1622, ¶ 21 ("Whether an investigative stop is converted into an arrest depends on . . . whether the degree of intrusion into the suspect's personal security was reasonably related to the officers' suspicions and the surrounding circumstances.").

{¶22} Because the State does not challenge on appeal the trial court's conclusion that the officers lacked probable cause to arrest Defendants, we need not review in-depth the reasons why the officers lacked probable cause. But we reiterate and agree with that conclusion in part to dispel the fiction that the State asks us to indulge on appeal—that the officers carried out a *Terry*-level seizure merely requiring reasonable suspicion. Not so—from the start of their stop of Defendants' vehicle, the officers intended to and did carry out a felony arrest of Defendants that

required probable cause, consistent with factual findings by the trial court. We agree with the trial court that the officers' conduct was unjustified by the circumstances and was unsupported by probable cause.

C.

{¶23} Finally, we turn to the State's argument on appeal: that the officers needed only reasonable suspicion to stop the vehicle and detain Defendants.

1.

{¶24} Before addressing the State's legal argument, we pause to review the record to tee up our discussion on reasonable suspicion because the factual record and the trial court's factual findings regarding probable cause and obstruction are relevant to the reasonable suspicion arguments advanced by the State on appeal.

{¶25} Most importantly, the record shows that the basis for the stop and the arrest—that Defendants obstructed official business—was an empty rabbit hole that the State itself led the trial court down. Officer Meyer, who initiated the stop, testified that the grounds to make the stop and arrest was obstruction of official business based on Defendants' attempt to leave the parking lot. Consistent with that testimony, the State responded to Defendants' motions to suppress below by arguing that the officers had probable cause that a crime had been committed, allowing them to legally stop Defendants' vehicle and immediately effectuate the arrests. It tied that probable cause argument to the notion that Defendants had obstructed official business, arguing that, after officers shined their lights at the vehicle, "[t]he vehicle then started and began to flee. This was obstruction of official business and the officers were lawfully permitted to stop the vehicle and make an arrest for a violation of O.R.C. 2921.31." Therefore, the State argued, and everyone

13

agreed, that the issue at hand before the trial court was whether probable cause existed to effectuate the arrest.

{¶26} The trial court firmly rejected obstruction as the basis for the stop and arrest, finding that "[Mr.] Andrews' car was moving at a slow rate of speed," that "the car did stop when Officer[s] activated their overhead lights," and that "the Defendant['s] vehicle was not fleeing." Based on those facts and other evidence presented at the suppression hearing, the court concluded that the State "fell far short of establishing even reasonable suspicion" that Defendants had obstructed official business in violation of R.C. 2921.31, which requires that a person create a "substantial stoppage" of an officer's lawful investigation with the intent to obstruct the officer's official duties. *In re R.B.*, 2021-Ohio-3749, ¶ 18-19 (1st Dist.).

{¶27} Competent, credible evidence in the record supports these factual findings, and we accordingly defer to them. *See Banks-Harvey*, 2018-Ohio-201, at ¶ 14. Nothing in the record indicates that Defendants drove out of the parking spot at an abnormal rate of speed or that they otherwise created a "substantial stoppage" of the officers' work. According to Officer Davis's testimony and confirmed by video recordings in evidence, Defendants' vehicle waited nearly a minute after officers initially shined their spotlights on it before slowly starting to roll out of its parking spot in the apartment complex lot. And although Officer Davis suspected the occupants might be trespassers, he admitted that residents of the apartment complex "absolutely" could have made the same decision to leave the parking lot in the same manner. Furthermore, Officer Meyer testified that prior to activating his cruiser's overhead lights and siren to initiate the stop, he gave *no indication* to

Defendants that they were not allowed to leave. And when he did activate the lights and initiated the stop, Defendants complied within just a few seconds.

{¶28} Without any basis to challenge these factual findings by the trial court on appeal, the State pivots on appeal to the question of whether reasonable suspicion existed for the initial stop. But, in essence, its reasonable suspicion and probable cause arguments below were both premised on one fact—that Defendants obstructed official business—as identified by the officers. The State's efforts to belatedly portray all of this as a stop supported by reasonable suspicion defies the record, its arguments below, and the factual findings of the trial court.

{¶29} Furthermore, the State on appeal fails to challenge the trial court's findings that there was no flight or obstruction, raising instead a new totality of the circumstances argument factoring in the weather, time of day, Defendants' alleged movements, the "shots fired" incident, and Defendants' tinted windows, all factors that were not raised as part of its reasonable suspicion argument below (it linked any reasonable suspicion argument to obstructing official business). But it advanced no argument below that these factors related to Defendants' alleged obstruction, and they nonetheless do not add up to probable cause of obstruction, or of any other crime. More to the point, the only crime ever identified before the trial court for which there might have been reasonable suspicion was the one the State now concedes wasn't committed—obstructing official business.

{¶30} Absent facts sufficient to support an obstruction argument, the State struggles on appeal to identify a different crime for which officers had probable cause for the arrests or reasonable suspicion for the stop. Indeed, the trial court

15

acknowledged that the State had no backup argument based on the anonymous tip and other facts.

2.

{¶31} Even indulging the State's new reasonable suspicion arguments on appeal, the square peg of reasonable suspicion simply doesn't fit in the round hole of what happened here. To temporarily seize Defendants and their vehicle by activating the cruiser's overhead lights, the officers needed reasonable suspicion, meaning "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette*, 572 U.S. at 396, quoting *Cortez*, 449 U.S. at 417-418. Considering the relevant facts and law described above, they lacked such a basis for the initial stop.

{¶32} First and foremost, Defendants were not reasonably suspected of obstructing official business or fleeing from police because they slowly drove out of the parking spot, as the trial court found as a factual matter. After officers shined their lights on Defendants' vehicle, the driver waited nearly a minute, turned on the car, and began to slowly drive away. At no point did officers command them to stop, ask them any questions, or even approach them in a way that suggested that they sought an interaction, consensual or otherwise. As soon as one of the officers activated his overhead lights to initiate a stop, the driver immediately complied. At this point, but at no point before then, the officers initiated a felony arrest, as we explained above.

{¶33} On appeal, the State identifies no basis in law for its argument that Defendants were seized and not free to leave when officers shined their spotlights on them (with no other signal or command). The State's reliance on the premise

16

that "unprovoked flight" is relevant to the reasonable suspicion inquiry here misses the point, because there was no "unprovoked flight"—Defendants waited nearly a minute, then slowly drove away after the officers did not approach them for an interaction. Their actions were nothing like the "[h]eadlong flight" of the defendant in *Illinois v. Wardlow*, 528 U.S. 119, 121-122, 124 (2000), which the State relies on here, who was holding an opaque bag and ran away from police in an area of heavy narcotics trafficking immediately upon looking towards the officers who were observing him from their vehicle, triggering a chase. Indeed, the trial court's findings (discussed above) refute the State's argument, and the State fails to directly challenge them.

{¶34} Thus, when Defendants slowly drove away from the parking lot after nearly a minute of the officers hanging around them for no expressed reason, the officers had no legal basis to stop the vehicle, because, simply put, there was no reasonable suspicion that the occupants or the vehicle were involved in any criminal activity.

{¶35} This is also not a situation where officers had any reason to believe that the "suspicious" vehicle was involved in a completed crime, i.e., possibly the "shots fired" incident from earlier that day somewhere vaguely near the parking lot. Although "reasonable suspicion that a vehicle may have been involved in a past felony" may justify a *Terry*-level stop of that vehicle, *State v. Stanford*, 2023-Ohio-1011, ¶ 9 (1st Dist.), here the State established no facts—not the tip nor anything officers observed before initiating the stop—suggesting that Defendants' vehicle or Defendants themselves had anything to do with the "shots fired" incident. Officers observed no firearms, no drugs, and no illegal activity in, near, or in any way

connected to the Defendants' vehicle prior to arresting them. They only observed Mr. Jackson, the passenger, recline his seat, and described observing some vague movement involving the steering wheel from one of the Defendants. At best, these sorts of movements might raise a nonparticular "hunch" of illegal activity, but *Terry* explicitly rejects warrantless searches and seizures "based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

{¶36} Having concluded that there was no reasonable suspicion to stop and seize the vehicle, we hold that no exception to the warrant requirement applies, and the officers violated Mr. Jackson's and Mr. Andrews's Fourth Amendment rights by seizing them. Lacking any justification to legally stop and seize the vehicle and its occupants, the officers' discovery of the firearms in the vehicle after they escalated the stop to a felony arrest is fruit of the poisonous tree and is subject to suppression under the exclusionary rule. *See State v. Bembry*, 2017-Ohio-8114, ¶ 17, citing *Mapp v. Ohio*, 367 U.S. 643, 652 (1961); *see also State v. Smith*, 2005-Ohio-5204, ¶ 23 (1st Dist.).

{¶37} Furthermore, our conclusion that the stop violated the Fourth Amendment forecloses the State's argument that the marijuana smell and smoke emanating from Defendants' vehicle after the stop was initiated, but before Defendants were ordered out of the vehicle, gave officers probable cause to search the car and thus discovery of the firearms was inevitable. It also precludes the argument that the firearms were in plain view after the stop was initiated. We accordingly agree with Defendants that exclusion of the firearms evidence is the proper remedy. The State's sole assignment of error is overruled.

\*　　\*　　\*

18

{¶38} Because the officers who stopped and seized Mr. Andrews and Mr. Jackson did so without probable cause and without reasonable suspicion that they were involved in criminal activity, we conclude that the officers violated their Fourth Amendment protections against unreasonable searches and seizures. We therefore overrule the State's assignment of error and affirm the judgments of the trial court granting Defendants' motions to suppress evidence of firearms recovered from a subsequent search of Defendants' vehicle.

Judgments affirmed.

**KINSLEY, J.,** concurs separately.
**WINKLER, J.,** dissents.

**KINSLEY, J.,** concurring separately.

{¶39} I concur that, on the arguments presented by the State in this case, the decision of the trial court should be affirmed. Nonetheless, I write separately to express my belief that the inevitable discovery doctrine may have authorized the search in this case if the State had preserved that argument before the trial court and presented it to us.

{¶40} Pursuant to the inevitable discovery doctrine, evidence that is illegally obtained can be properly admitted in a criminal trial once it is established that the evidence "*would have been* ultimately or inevitably discovered during the course of a lawful investigation." (Emphasis added.) *State v. Huffman*, 2010-Ohio-5116, ¶ 18 (8th Dist.), citing *State v. Perkins*, 18 Ohio St.3d 193, 196 (1985). This inquiry is not without possible limitations. For example, in *State v. Keith*, 2008-Ohio-4326, ¶ 14 (2d Dist.), the Second District held that the inevitable discovery doctrine does not apply to evidence seized without a warrant.

**{¶41}** To the extent the inevitable discovery doctrine applies in a case, it examines not what actually took place during the course of a search, but instead what hypothetically could have occurred. It thus asks us to envision lawful action by the police and to question whether the evidence would have been uncovered in that scenario without a constitutional violation. *See, e.g., State v. Hapney*, 2002-Ohio-3250, ¶ 45-47 (4th Dist.).

**{¶42}** Looking at what could have taken place here, Defendants do not dispute that the officers in this case could have lawfully initiated a consensual encounter with them by engaging in a routine traffic stop. *See State v. Berry*, 2018-Ohio-4791, ¶ 23 (5th Dist.) (describing a consensual encounter as one in which an officer initiates a conversation for the purpose of requesting information and the subject of the request is free to refuse and to walk away). Doing so would have involved the officers illuminating the flashing lights on their cruiser, approaching Defendants' vehicle, and asking to speak with Defendants. At that point, the guns in plain view on the back seat of the car would have been visible to the officers. *See, e.g., State v. Wilson*, 2011-Ohio-707, ¶ 16 (8th Dist.) (upholding search and seizure of guns from car during lawful traffic stop on the basis that they were in the officers' plain view).

**{¶43}** Given these facts, it is therefore possible, perhaps even likely, that we would have concluded the guns would be subject to inevitable discovery without any violations of the Fourth Amendment were we asked to consider the question. The State, however, did not advance this argument. Not to the trial court. Not on appeal.

**{¶44}** Appellate courts only resolve issues brought to them by the parties before them. *See Kalish v. Trans World Airlines, Inc.*, 50 Ohio St.2d 73, 79 (1977). This important principle ensures that courts function as neutral arbiters of disputes, rather than as advocates for one side or the other. I am therefore unable to resolve

this case on the basis of an argument that the State did not make. For this reason, I concur in the court's resolution of the issues actually presented in this appeal.

**WINKLER, J.,** dissenting.

{¶45} I am firmly convinced that the stop and seizure of the defendants was reasonable under the Fourth Amendment, and I would hold that the trial court erred in granting Jackson's and Andrew's motions to suppress the seized firearms. I respectfully dissent from the majority's opinion.

{¶46} In its brief, the State argues that the police officers had a reasonable suspicion of criminal activity, justifying an investigative stop. The majority points out the distinction between that argument and the State's argument in the trial court, that the officers had probable cause to arrest the defendants for obstructing official business. While it is true that at the hearing on the motions to suppress, the State primarily relied on its argument that the officers had probable cause to arrest the defendants for obstructing official business, the propriety of the investigative stop was clearly at issue.

{¶47} In their written motions to suppress and in oral argument in the trial court, both defendants argued that the police officers did not have a reasonable and articulable suspicion of criminal activity to justify an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968). In its memorandum in response to the motions to suppress, the State maintained the officers had a reasonable, articulable suspicion that the individuals in the car were obstructing the investigation when they attempted to flee the scene.

{¶48} At the hearing on the motions to suppress, following the defense counsel's opening statement, the court asked, "Are you arguing this is an arrest?" Defense counsel replied, "Your honor we would be arguing both that this was an arrest

because of the amount of force used made it an arrest, but we would also be arguing that the police did not have a good enough reason, did not have a reasonable, articulable suspicion to turn this even into a *Terry* stop, an investigative stop . . . ." The State, in its closing argument, continued to argue that the police were conducting a *Terry* stop when the defendants attempted to flee the scene. During closing argument, defense counsel again argued that regardless of whether the standard was probable cause or reasonable suspicion, "this fails both."

{¶49} An investigative stop is a seizure within the meaning of the Fourth Amendment that must be supported by objective justification. *State v. Andrews*, 57 Ohio St.3d 86, 87 (1991); *State v. Houston*, 2020-Ohio-5421, ¶ 57. In *Terry*, the United States Supreme Court held that a police officer may perform an investigative stop when the officer has a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. *State v. Hawkins*, 2019-Ohio-4210, ¶ 19; *Andrews* at 87. The police officers must point to specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrant that intrusion. *Andrews* at 87; *Houston* at ¶ 57. The standard is objective: would the facts available to the officers at the moment of the seizure have warranted an individual of reasonable caution in the belief that the action taken was appropriate? *Andrews* at 87; *Houston* at ¶ 57.

{¶50} Specifically, in relation to automobiles, if there is a reasonable and articulable suspicion that an automobile or its occupants are subject to seizure for a violation of the law, stopping that automobile and detaining its occupants are reasonable under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *Houston* at ¶ 58. A court determines the validity of an investigative stop by

looking at the totality of the circumstances. *State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph one of the syllabus; *Houston* at ¶ 58.

**{¶51}** Reasonable suspicion is an "elusive concept," and "[p]recisely defining reasonable suspicion is not possible." It is not readily reduced to a "neat set of legal rules." *Hawkins* at ¶ 20. It is a less demanding standard than probable cause. *Id.*; *In re J.C.*, 2019-Ohio-4815, ¶ 14 (1st Dist.), quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989). But it is something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Hawkins* at ¶ 20; *In re J.C.* at ¶ 14. The evaluation of the constitutionality of a stop should be based on the totality of circumstances "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Hairston*, 2019-Ohio-1622, ¶ 10, quoting *Andrews*, 57 Ohio St.3d at 87-88.

**{¶52}** While a police officer needs a reasonable and articulable suspicion that an individual was engaged in criminal activity, that officer does not have to articulate that that individual had committed a specific offense. "The officer need not have suspected the appellant of the specific offense for which he was ultimately arrested at the time of the stop so long as the officer had reasonable suspicion to effect the investigatory stop." *State v. Arnold*, 1995 Ohio App. LEXIS 383, *10-11 (5th Dist. Jan. 6, 1995).

**{¶53}** Further, reasonable suspicion is an objective standard. *State v. Rogers*, 2022-Ohio-4535, ¶ 23 (1st Dist.). A police officer's subjective belief or motive for conducting the stop is irrelevant. *State v. Newman*, 2021-Ohio-197, ¶ 23 (5th Dist.); *State v. Stover*, 2017-Ohio-9097, ¶ 17 (12th Dist.); *State v. McCandlish*, 2012-Ohio-3765, ¶ 9 (10th Dist.). The totality of the circumstances must be considered through the "eyes of the reasonable and prudent police officer who must react to events as they

unfold." *Hawkins*, 2019-Ohio-4210, at ¶ 21, quoting *Andrews*, 57 Ohio St.3d at 87-88; *State v. Wright*, 2022-Ohio-2161, ¶ 15 (1st Dist.). Thus, the officers' testimony that they believed a stop was justified because the defendants were obstructing official business is not dispositive.

{¶54} Earlier in the day, the officers were informed at roll call that gunshots had recently been fired on the same street where the apartment complex was located. They were also informed that tensions were rising among juvenile groups and that there was the potential for retaliation. They received a dispatch to investigate a suspicious vehicle in the parking lot of the apartment complex. Officer Meyer testified that it was a high-crime area. Further, when he was asked if there had been "previous gun calls" to the apartment complex, he replied, "not at that exact complex, but in the vicinity of it." A police officer's experience with criminal activity and an area's reputation for criminal activities are relevant factors in the reasonable-suspicion analysis. *Hairston*, 2019-Ohio-1622, at ¶ 12; *In re J.C.*, 2019-Ohio-4815, at ¶ 17 (1st Dist.).

{¶55} It was dark and rainy when the officers received the dispatch. Upon arrival at the apartment complex, they shone a spotlight on various cars in the lot. An officer's use of a light to better illuminate a vehicle's interior does not convert the officer's actions into a search withing the meaning of the Fourth Amendment. *In re J.F.*, 2024-Ohio-1950, ¶ 11 (1st Dist.). When the officers located the gold sedan described as suspicious, they observed that it had tinted windows, making it difficult to see inside.

{¶56} Immediately after the police shined their spotlight on the car, the officers saw Jackson, who was in the passenger seat of the car, quickly recline his seat,

as if he was trying to hide. The steering wheel moved, as if a leg or an arm hit it. Then the driver, Andrews, turned on the headlights, and attempted to drive away.

{¶57} A defendant's movements, such as furtive gestures, can be considered in analyzing whether a police officer had reasonable suspicion. *State v. Bobo*, 37 Ohio St.3d 177, 179-180 (1988); *State v. Simmons*, 2013-Ohio-5088, ¶ 17 (12th Dist.). While a furtive gesture, standing alone, does not create probable cause for a search, reliance on a clandestine gesture when other facts indicating a reasonable suspicion of criminal activity are also present is sufficient for a *Terry* stop. *Bobo* at 179-180; *Simmons* at ¶ 17.

{¶58} Unprovoked flight upon seeing police officers is a relevant consideration in determining whether the totality of the facts and circumstances are sufficient to justify a *Terry* stop. *Illinois v. Wardlow*, 528 U.S. 119, 124-125 (2000); *State v. Jordan*, 2006-Ohio-1813, ¶ 12 (2d Dist.). While such behavior is not "necessarily indicative of criminal behavior, and can be consistent with innocent conduct, *Terry* recognized that officers may briefly detain individuals to resolve ambiguity in their conduct." *Jordan* at ¶ 22.

{¶59} The defendants argue that the evidence did not show that the vehicle fled the scene. Instead, they contend that it merely drove away at a low rate of speed. Flight means some escape or alternative attempt to avoid prosecution. *State v. Robinson*, 2007-Ohio-2388, ¶ 19 (1st Dist.); *State v. Brundage*, 2004-Ohio-6436, ¶ 17 (1st Dist.). It requires the accused to appreciate that he or she has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found. *State v. Scott*, 2022-Ohio-4054, ¶ 45 (11th Dist.).

{¶60} The speed that the defendants used in fleeing is not determinative. They were aware of a police presence, and even if they had no knowledge about the previous

shooting, the smell of burnt marijuana in the car supports the inference that they were fleeing the scene. The Fourth Amendment does not require a police officer who lacks the precise level of information necessary for probable cause to arrest "to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *State v. Tidwell*, 2021-Ohio-2072, ¶ 46, quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972).

**{¶61}** Given the totality of the circumstances known to the officers as they evolved at the time of the search, the officers had a reasonable and articulable suspicion that the car and its occupants were subject to a seizure for a violation of the law. As the prosecutor pointed out at the hearing on the motions to suppress, "It's reasonable that they stopped the vehicle. It would not be reasonable for them to say oh, he left, that's all we can do." The officers would have been derelict in their duties had they not pursued the investigation under the circumstances.

**{¶62}** The State also argues that the trial court erred in finding that the officers' actions of activating lights and sirens, broadcasting instructions by loudspeaker, and directing defendants to exit from the vehicle converted the stop into an arrest. In *State v. Evans*, 67 Ohio St.3d 405 (1993), the Ohio Supreme Court followed *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), and held that a police officer may order a motorist to get out of a car that has been properly stopped for a traffic violation, even without a suspicion of criminal activity. The court referred to this type of order as a *Mimms* order. *Evans* at 407-408.

**{¶63}** "[T]he order to step out of the vehicle is not a stop separate and distinct from the original traffic stop." *State v. Jackson*, 2021-Ohio-517, ¶ 11, quoting *Evans* at 408. The state's "'legitimate and weighty' interest in officer safety outweighs the 'de minimus' additional intrusion of requiring the driver . . . to exit the vehicle." *State v. Isles,* 2020-Ohio-3061, ¶ 15 (5th Dist.), quoting *Mimms* at 110-111. "It is so minimal

26

and insignificant an intrusion that the *Mimms* court refused to apply the requirements of an investigatory stop." *Evans* at 408. An officer needs no justification beyond that necessary for the initial stop to order a driver from the car. *State v. Jackson*, 2022-Ohio-4365, ¶ 13. Later, in *Maryland v. Wilson*, 519 U.S. 408 (1997), the United States Supreme Court expanded that rule to include the passengers in the car. *In re J.F.*, 2024-Ohio-1950, ¶ 17 (1st Dist.).

**{¶64}** Further, this court has held that where a police officer has lawfully stopped a driver for a window-tint violation, the officer could properly order the driver to get out of his van. *See State v. Leonard*, 2007-Ohio-3312, ¶ 16 (1st Dist.). Consequently, the defendants' Fourth Amendment rights were not violated when the officers ordered them to get out of the car. *See Houston*, 2020-Ohio-5421, at ¶ 64 (1st Dist.); *State v. Emmons*, 2016-Ohio-5384, ¶ 14 (1st Dist.).

**{¶65}** Courts have recognized the practical necessity that the police "exercise unquestioned command of the situation." *Brendlin v. California*, 551 U.S. 249, 258 (2007), quoting *Wilson* at 414. It is reasonable "to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that jeopardize his safety." *Id.* Moreover, police officers may take steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a] stop." *Hairston*, 2019-Ohio-1622, at ¶ 21, quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985). The mere use or display of force during a stop will not necessarily convert a stop into an arrest. *Id.* Whether an investigative stop turns into an arrest depends on whether the officers had a reasonable suspicion to make the stop and whether the degree of intrusion into the suspects personal security was reasonably related to the officers' suspicions and the surrounding circumstances. *Id.*

27

**{¶66}** Both police officers testified that the officers' decision to approach the car with weapons drawn and the orders to drop the keys and exit from the vehicle were motivated by safety concerns. Given the officers' knowledge of a report of shots fired on the same street, concerns about escalating tensions between groups of juveniles, previous violent crimes in the area, the area's reputation as a high-crime area, the defendants' movements within the vehicle, and the fact that it was rainy and dark, the precautions taken by the officers were reasonable and did not convert the stop into an arrest.

**{¶67}** Next, the State argues that when the officers smelled burnt marijuana and observed smoke emanating from the car, they had probable cause to search the car. Under the automobile exception to the warrant requirement, police officers may conduct a warrantless search of an entire vehicle if the officers have probable cause to believe that they will discover evidence of a crime. *State v. Moore*, 90 Ohio St.3d 47, 51 (2000); *State v. Payne*, 2023-Ohio-4198, ¶ 11 (1st Dist.). Officers who have probable cause to search an automobile may search all packages and containers inside the car if they have probable cause to believe that the package or container contains contraband. *Wyoming v. Houghton*, 526 U.S. 295, 302, (1999); *Payne* at ¶ 11.

**{¶68}** Probable cause to search exists where "known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *State v. Jones*, 2014-Ohio-1201, ¶ 16 (1st Dist.), quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Whether probable cause exists depends on the objective factors articulated by the officer. If the search is objectively reasonable, the officer's stated reason for the search is irrelevant. *Payne* at ¶ 12; *In re L.S.*, 2016-Ohio-5582, ¶ 16 (1st Dist.).

**{¶69}** The Ohio Supreme Court has held that the smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to search a motor vehicle, pursuant to the automobile exception to the warrant requirement. *State v. Vega*, 2018-Ohio-4002, ¶ 15, quoting *Moore*, 90 Ohio St.3d at 51. Once the officers saw smoke and smelled burnt marijuana, they had probable cause to believe that the car contained contraband. Therefore, they were justified in conducting a warrantless search of the vehicle and any containers it had inside under the automobile exception to the warrant requirement. *See Payne* at ¶ 15; *In re L.S.* at ¶ 17-20.

**{¶70}** Consequently, I would hold that the trial court erred in granting the defendants' motions to suppress. I would sustain the State's assignment of error, reverse the trial court's judgment, and remand the matter for further proceedings.

Please note:

The court has recorded its entry on the date of the release of this opinion.